**Terry James COLE**

v.

**Warren MELVIN.**

**No. Civ. 75–3002.**

United States District Court, D. South Dakota.

Nov. 21, 1977.

Robert C. Riter, Jr., Pierre, S. D., for plaintiff.

William J. Srstka, Jr., Pierre, S. D., for defendant.

## MEMORANDUM OPINION

BOGUE, District Judge.

This lawsuit arose from a disagreement about the meaning of a contract for the sale of exotic cattle. Plaintiff Terry Cole is from Gainsborough, Saskatchewan; Defendant Warren Melvin lives in Hyde County, South Dakota. The parties are properly before this Court under 28 U.S.C. § 1332(a)(2).

Although several material facts are at issue, the series of events leading to the commencement of this lawsuit is generally agreed upon and will be narrated in a summary manner. In May of 1974 Cole agreed to purchase sixteen (16) Blonde D'Aquitaine heifers from Melvin. The terms of this agreement were set forth in their entirety in a written contract (Exhibit 1). The same written contract indicates that Melvin agreed to repurchase "same heifers" from Cole later in 1974.[1]

The agreement was made in Gainsborough, Saskatchewan where the parties happened to meet. Cole had previously bought cattle from Melvin. On this occasion the two men talked over a possible cattle deal; and after some deliberation, Cole decided to buy some heifers which Melvin had offered to sell.

A form for a written contract was provided by Melvin. Cole's wife wrote the terms of this particular agreement in the blank spaces. Paragraphs three and four, the construction of which is very important for a resolution of this case, state as follows:

> Whereas the two parties named above consider it advantageous to agree upon sale and purchase price for above described cattle, Terry James Cole has agreed to

---

1. Because the first seller (Melvin) becomes the buyer in the second agreement, we have avoided the terms buyer and seller and vendor as well as vendee. We will simply refer to the parties by their last names throughout the opinion.

purchase the above 16 heifers from Warren Melvin for the total sum of Forty-nine Thousand dollars with the guarantee of health papers and also guarantee that all heifers will be fertile for breeding. Also Warren Melvin agrees to purchase same heifers at Four Thousand dollars each guaranteed safe in calf to Purebred Blonde D'Aquitaine bulls.

If Terry James Cole sells the Blonde heifers before July 31, 1974 this contract will be dissolved. If not then the heifers will be kept and guaranteed safe in calf for delivery to the closest United States Port of Entry no later than October 1st, 1974.

The first question to be resolved in this lawsuit is whether the parties intended that Melvin would be obligated to repurchase each heifer that became pregnant (even if less than 16 became pregnant) or alternatively whether Melvin would be obligated to repurchase all 16 heifers, but only if all 16 were guaranteed safe in calf. The answer to this question *may be* outcome-determinative on the question of liability. There are, however, other provisions in the contract as well as subsequent acts of the parties which will merit some attention.

On or about June 15, 1974, Melvin hauled the heifers to Portal, North Dakota. In accordance with prior business practice, the parties met at Portal where the facilities of one Oliver Granrude were used for transfer of the cattle. Because Cole's first check for the cattle had been returned for non-sufficient funds, the men discussed the question of payment. Cole assured Melvin that he had obtained financing and that his account had sufficient funds, so Melvin let Cole take delivery of the heifers. They parted without altering the terms of the contract.

The contract allowed Cole an option for disposition of the heifers. Cole could have sold them to whomever he pleased before July 31, 1974. If he had exercised that option, then the agreement to resell them to Melvin would have been dissolved. No sale was made by Cole as of July 31, 1974, so the agreement between Cole and Melvin for repurchase of "same heifers" (whatever the agreement meant) remained binding.

On September 8, 1974, Cole wrote a letter to Melvin (Exhibit 2). The letter appears to deal in part with a problem of exchange rates and although defendant has tried to convince us otherwise, the letter appears to raise a question about Melvin's intention of performing according to the terms of the contract. As far as we know, Melvin made no response to this letter.

October 1 came and went. It has been stipulated that Cole never did deliver the cattle to the Port of Entry at Portal, North Dakota (Tr. 120–1). In the weeks following October 1, beginning on October 8, Cole made several telephone calls to Melvin (see Exhibit 3). Cole testified that he "was trying to get ahold of Warren to see when he would be ready to take purchase of these cattle . . . ." (Tr. 10.) Cole further testified: "I told him there was 11 head that was guaranteed safe with calf ready to be tested to take to the border." (Tr. 11.) According to Cole, Melvin was not just stalling; rather he was trying to move the cattle. Melvin would get back to him as soon as he (Melvin) found a buyer.

Melvin acknowledges the telephone conversations, but his recollection of the substance of the conversations is somewhat different than Cole's. As Melvin recalls it, the first telephone conversation, on October 8, 1974, began (in relevant part) with an inquiry by Cole as to whether Melvin was ready to take delivery on the heifers. According to Melvin the dialogue continued substantially as follows: [2]

Melvin: Yes, if you have all the heifers safe in calf, I am ready to take delivery.

Cole: I don't have.

Melvin: I can't see how I can take delivery on the heifers. The heifers are not completely safe in calf as the contract reads.

Cole: (Apparently affirms that at least 11 heifers are safe in calf.)

Melvin: How do you know? Did you have them pregnancy tested?

2. (Tr. 103.)

Cole: No. They had never come back in heat.

Cole denied that Melvin ever told him that he would not take the heifers because only 11 were safe in calf. (Tr. 23.)

Cole has records to indicate that he called several more times. The next telephone call Melvin recalls was in November, sometime before the "Agribition" at Regina. It appears that the cattle deal was not discussed extensively after October 8 on the telephone nor was it discussed at the "Agribition" when the two men met.

The price of cattle dropped; Cole foresaw loss of money coming; and by the end of November, 1974, he had contacted a lawyer to initiate legal proceedings.[3] (Ex. 9.) He kept the cattle several months, however, as it appears that the animals were sold in January of 1976. (Ex. 5.) Due to a considerable change in markets, Cole got slightly more than $7,000.00 for cattle which he had purchased from Melvin at the price of $49,000.00.

## I.

Initially we face some questions as to what law should be applied to the facts of this case. The parties have agreed that the Uniform Commercial Code (U.C.C.) as adopted by South Dakota is applicable. In applying the U.C.C. we will refer to various sections as they are numbered in the S.D. Comp. Laws Ann. (S.D.C.L.) and will include parenthetically the citations to the official version.[4]

The case presents some questions, however, that cannot be resolved by reference to the U.C.C. alone. This Court has determined that the contract in question has some ambiguities, especially where the obligations of Plaintiff Cole are set forth. The U.C.C. contains many aids to construction of contracts, but it does not embody the commonly accepted canons of construction that can be invoked when an ambiguity arises; hence, we have looked to S.D.C.L.

57–1–25 (1–103) which allows that principles of law and equity may be applied to problems of commercial law where the code itself does not govern.

The ambiguities as to Cole's duties are patent rather than latent ambiguities, i. e. they arise from the obscurity of the language used in the contract and not by virtue of some extrinsic fact. As a general rule parol evidence is admissible to explain ambiguous terms of a contract. L. Simpson, LAW OF CONTRACTS, § 101 (2nd Ed. 1965). This Court's task, therefore, is to consider all of the evidence produced at the trial and to arrive at an understanding of what the written contract meant at the time of its creation.

We are fully aware that the Court must avoid rewriting the contract; rather, it will be this Court's endeavor to establish the intention of the parties at the time the agreement was made. *See* 17 Am.Jur.2d, *Contracts*, § 244 (1964). We cannot pierce the parties' mental processes to find out what images were on their brains, but must be content to examine the words which were used in the business context in which they were used in order to objectively establish the parties' intentions. Looking at the words of the contract in the business setting in which they were written, the Court will try to answer the primary questions upon which a resolution of the controversy turns.

## II.

As has been stated, *supra*, a crucial question is whether Melvin agreed to purchase each heifer guaranteed safe in calf, or whether he agreed to purchase 16 heifers on the contingency that all sixteen would be guaranteed safe in calf. This question is closely connected with the question of whether or not Cole was required to provide proof of pregnancy before Melvin would be obligated to take delivery. For clarity of

---

3. A complaint was filed January 22, 1975.

4. "Official version" means the Uniform Commercial Code as adopted by the National Conference of Commissioners on Uniform State Laws.

analysis, we will take the second question first.

A. *In order for Cole to perform his obligations in accordance with the contract, was he required to have the heifers pregnancy tested, and to provide proof of pregnancy to Melvin before tendering the heifers?*

■ We begin our analysis with some study of Melvin's earlier "guarantee" of fertility. Melvin guaranteed that all sixteen heifers were fertile, but he was not required to provide, and did not provide, at any time any proof of fertility. He fully admitted that he could have hired a veterinarian and had the heifers tested for fertility. (Tr. 113.) The written contract required no such tests, and we must assume that the bargain did not require any such tests.

Cole guaranteed that the heifers which he would resell to Melvin would be pregnant; in effect, Cole made an agreement as to pregnancy that paralleled Melvin's guarantee of fertility. The written contract mentions nothing about testing for pregnancy. The question is whether or not such a requirement ought to be read into the bargain.

■ Melvin's guarantee of fertility was his promise written in the contract, and on the basis of that promise, Cole took delivery in June. Thus the transaction in June with delivery from Melvin to Cole was not contingent upon any extrinsic proof of fertility; if a heifer turned out to be sterile, Cole was left with the possibility of seeking a remedy at a later time. Cole's obligation to perform by taking delivery and paying for the heifers was not contingent upon proof of fertility.

■ Yet, Melvin has tried to convince the court that the reverse transaction scheduled for October 1, 1974, required extrinsic proof of pregnancy by Cole (Tr. 103). This would make the sale from Cole to Melvin contingent upon the production of some verification by a veterinarian that the heifers were safe in calf, i. e. Melvin's obligation to perform would be contingent upon proof of pregnancy. To conclude that the contract contained that contingency, we would have to read into the contract the requirement of a pregnancy test. We refuse to do so, as that would result in diametrically opposed inferences being drawn from parallel clauses in the contract.

■ As the Court's analysis of this problem has progressed, it has become increasingly clear that we are presented with a legal question the resolution of which necessitates that a distinction be made between the idea of a promise and the idea of a condition precedent to a party's duty to perform. A promise *can* constitute a condition precedent to another party's duty to perform, but a promise is not necessarily such a condition. Corbin has stated:

> In order that the promise of one party may be expressly conditioned upon some performance by the other party, it certainly is not sufficient that the latter makes an express promise to render the performance. An express promise by one party is an entirely different thing from an express condition of the other party's duty. A. Corbin, Contracts, § 639 (1 vol. Ed., 1952).

This distinction must be made in construing the present contract.

■ Cole promised that the heifers which he intended to sell back to Melvin would be safe with calf. Defendant Melvin's argument in a nutshell is that this promise constituted a condition precedent; i. e. pregnancy was an event which had to occur, and proof thereof had to be provided, before Melvin's duty to perform arose. According to the law of contracts, as is evident in the quotation from Corbin, this express promise (guarantee) as it appears on the face of the contract is not sufficient to create a condition precedent.

■ A promise to perform will not be categorized as a condition precedent to another party's duty to perform unless the parties so intended and agreed; moreover, an agreement that a promise to perform some particular act shall constitute a condi-

tion precedent will not be inferred from ambiguous language unless circumstances compel such a conclusion. We must find either an express agreement that the event or act relied upon by the defendant was meant to be a condition precedent or that the circumstances surrounding the contract so indicate. In the language of this contract we find only a promise, not a condition precedent, and in the circumstances surrounding the bargain we find nothing that would indicate otherwise.

The answer to the question raised in part II, A of this opinion is negative. It was not the intention of the parties that Cole would provide proof of pregnancy before he delivered the heifers to Melvin; in any event, such proof was not a contingency upon which the transaction contemplated by the parties depended.[5]

B. *Did Cole have a legal obligation to have all sixteen heifers safe in calf by October 1, 1974, in order to fulfill his part of the bargain and thereby trigger Melvin's duty to accept the heifers and to tender payment?*

Counsel for the defendant argues strenuously that Cole's part of the bargain was to have all sixteen heifers in calf by October 1, 1974, and anything short of that ought to be pegged as a breach of the contract. This is closely related to the argument that the contract in question was *not* intended to be an installment contract but rather a contract for all heifers to be delivered at one time. Defendant contends that a construction of the contract which allows for delivery of any number of heifers less than sixteen turns the contract into an installment contract because Melvin would have been required to make repeated trips to the Canadian border to pick up one or more newly impregnated heifers.

If defendant's alternatives (that the contract was either for sixteen heifers or was an installment contract) were the only possibilities, then defendant's argument would be most compelling. It appears to us, however, that this way of framing the question is an ingenious method of creating a false dichotomy. In other words, a conclusion that the contract did not require Cole to provide sixteen impregnated heifers on October 1, 1974, does not, *a fortiori*, make the bargain into an installment contract.

We are convinced that the contract for sale of "same heifers" safe in calf from Cole to Melvin was a contract for each of those heifers which Cole could get safe in calf. Any heifer not safe in calf by October 1, 1974, was a heifer which Melvin was never obligated to accept. Thus, we are not concluding or even suggesting that Melvin had an obligation to make more than one trip to the Canadian border. His obligation was to accept those heifers which Cole guaranteed safe in calf, nothing more and nothing less.

Several considerations have led us to the conclusions stated, *supra*. In the first place there was, in the commercial setting in which the bargain was struck, no magic to the number sixteen. Melvin admits as much. (Tr. 119.) Had one heifer died, he would have accepted fifteen. Presumably, if two had died, he would have accepted fourteen. There is nothing in the record in this case to indicate that the benefit of the bargain for Melvin required that he have sixteen heifers or fifteen heifers or any particular number.

Furthermore, in the commercial setting in which this agreement was formed, there is no logical reason whatever why the death of a heifer should relieve Cole of the obliga-

---

**5.** Cole testified that he was planning to have the heifers pregnancy tested by a licensed veterinarian. (Tr. 49.) He was waiting for word that Melvin was coming up before he did it, so he may well have intended all along to have such testing done. In addition, he may have been able to test adequately himself because of his training in artificial insemination. (Ex. 4.)

Thus, if the exchange had ever taken place, it would probably have been preceded by some testing for pregnancy. We do not believe, however, that this probability proves that evidence of pregnancy was something Cole had *to* produce in advance to perform his part of the bargain, i. e. it was not a condition precedent.

tion to produce a pregnant heifer, and at the same time the barrenness of a heifer should automatically result in a breach by Cole. We return to the fact that the heifers were not tested for fertility before the transfer from Melvin to Cole. Given the fact that there was no "proof" of fertility, it seems incontrovertible that there was at least *some* risk that one or more heifers would not conceive. Following Melvin's theory to its logical conclusion, even one failure to conceive would have relieved him of his duty to accept all the other heifers which had conceived, when the failure of one to conceive might well have been due to infertility.

█ That conclusion is so much at odds with reason that we simply cannot accept it as being a sensible construction of the contract. We believe that it was the intention of the parties at the making of the contract that Melvin would take that number of heifers which had conceived by October 1, 1974. One could create troublesome hypothetical situations, e. g. what if only one had conceived? Would Melvin have then had to travel to Portal to pick up one heifer? Fortunately, that hypothetical situation is not before us. The simple fact is that 11 heifers were with calf by October 1, 1974. (Tr. 15, 16.) Melvin had a duty to accept those heifers if they were tendered.

C. *Specific findings and conclusions:*

In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court hereby makes and adopts the following findings of fact and conclusions of law:

1. On May 25, 1974, Terry Cole agreed to buy and Warren Melvin agreed to sell sixteen Blonde D'Aquitaine breeding heifers for a price agreeable to both.

2. Melvin expressly guaranteed that all heifers were fertile.

3. Melvin supplied no proof of fertility.

4. Cole and Melvin further agreed that, if the heifers were not sold by July 31, 1974, Melvin would buy back each heifer which was safe in calf from Cole.

5. It was part of the agreement that Cole would guarantee the heifers to be safe in calf.

6. Cole supplied no proof of pregnancy.

7. Cole was not required by the agreement of May 25, 1974, to supply any proof of pregnancy.

8. Cole was not obligated under the agreement to guarantee that all sixteen heifers were safe in calf by October 1, 1974.

9. Time was not of the essence in this contract.

10. Melvin had the duty under the contract to accept eleven heifers guaranteed safe in calf, if in fact, eleven were tendered at or near the time specified in the contract.

III.

Having resolved the controversy relative to Cole's duties pursuant to the contract, it now becomes necessary to reexamine the series of events outlined, *supra*, to determine who breached the contract. Plaintiff's arguments center mainly, though not entirely, upon two particular events; these are: (1) the letter to Melvin dated September 8, 1974, and (2) the telephone call to Melvin on October 8, 1974. Plaintiff first argues that Melvin's failure to answer the inquiries put forth in the letter of September 8, 1974, constituted an anticipatory breach which relieved Cole of any duty to perform. Second, plaintiff contends that he did indeed tender the heifers at a point in time reasonably near October 1, 1974; and that Melvin's failure to accept the heifers should be categorized as a breach. Each argument will be examined separately.

A. *Was Melvin's failure to answer Cole's letter of September 8 an anticipatory repudiation of the contract?*

S.D.C.L. § 57-7-23 (2-609(1)), which appears to be directly on point, states as follows:

A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect

to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

The section is designed to obviate the necessity of one party guessing whether or not the other intends to perform when he begins to receive signals that cause him concern. *See* J. White and R. Summers, Uniform Commercial Code § 6–2 (1st Ed. 1972).

The first requirement for application of the law embodied in the above-quoted section is that "reasonable grounds for insecurity arise" with respect to the performance of one of the parties. Clearly, the drafters of the code did not intend that one party to a contract can go about demanding security for the performance of the other whenever he gets nervous about a contract. Some reason for the demand for assurance must precede the demand.

In this case we are convinced that the letter of September 8, 1974, demands assurance of performance where it states:

If you are not satisfied with this and have any attention [sic] of backing out on our contract, then please forward the recordation papers to me so I can sell these heifers up here. If you still want the heifers then I will gladly keep them for you, they are on a self-feeder of rolled oats and are doing very well except for the couple of young RWF heifers that haven't come in heat yet.

Please let me know what your plans are as soon as possible.

The question that perplexes us is what, if anything, gave Cole a reason to be apprehensive.

From the letter itself and from some of the testimony at trial, it would at first seem plausible that the delay in forwarding the papers for the heifers might have caused Cole some concern. After consideration, however, we must unequivocally state that a two to three month delay in sending the papers was not a ground for insecurity on Cole's part. Extended delays were normal (Tr. 76), and Cole must have been aware of that because of his experience in dealing in exotic cattle. More importantly, Melvin's failure to have the papers to Cole by September would be more comprehensible if he intended to repurchase the heifers than if he did not. In short, there is nothing about the transfer of the papers that could be classified as a reasonable ground for insecurity.

After a search of the transcript, we have nothing else which even approaches being a factually established ground for insecurity. Obviously, something prompted Cole to ask Melvin if he was planning to perform. But, from everything in the record, it appears that Cole was prompted by purely subjective concerns which were not rooted in any objective facts that can now be legally equated with reasonable grounds for insecurity.[6]

Because Cole had no basis upon which to put forth his demand for adequate assurance of performance, Melvin had no duty to give any assurance. That conclusion, of course, resolves entirely the question of anticipatory breach on Melvin's part. There was no anticipatory breach. The Court is forced to proceed to the question of whether or not Cole made a proper tender.

B. *Did Cole make a proper tender of the heifers so that Melvin had an obligation to accept them and tender payment?*

The legal requirements for a tender of delivery are specified in S.D.C.L. § 57–6–6 (2–503(1)). According to this section:

Tender of delivery requires that the seller put and hold conforming goods at

---

6. S.D.C.L. § 57–7–24 (2–609(2)) provides in part that between "merchants" the grounds for insecurity shall be determined according to commercial standards. S.D.C.L. § 57–2–7 (2–104(1)) defines "merchant". We do not need to decide whether both plaintiff and defendant are merchants or what commercial standards are in this instance as there is no evidence by any objective standard for a reasonable ground for insecurity.

the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. The manner, time and place for tender are determined by the agreement . . . .

Cole and Melvin agreed upon the time for tender and the place of tender. The cattle were to be tendered for delivery at the closest United States port of entry (presumably Portal, North Dakota) no later than October 1, 1974. (Ex. 1.) Unless Cole had a legal excuse for not taking the heifers to Portal, North Dakota on or before October 1, 1974, then it would appear that Cole breached the contract by failing to make a proper tender of delivery.

Cole argues, however, that he was ready, willing and able to tender delivery of the heifers, but that his reasonable efforts to do so were frustrated by Melvin's lack of cooperation. The question then arises as to whether or not Melvin had any duty to cooperate with Cole by communicating with him prior to October 1, 1974, on matters relative to the delivery of the cattle. Plaintiff's argument that tender for delivery was proper seems to hinge on the assumption that Melvin had some responsibilities in that regard, and that he could not simply wait in South Dakota for a telephone call from Portal, North Dakota, assuring him that the heifers were now ready to be picked up.

■ Our examination of the code has led us to believe that cooperation respecting performance of contracts is not an alien concept, but is something required with specificity by the code. *See* S.D.C.L. § 57–4–21 (2–311(3)). This section states in relevant part:

[W]here one party's cooperation is necessary to the agreed performance of the other but is not seasonably forthcoming, the other party in addition to all other remedies

(1) Is excused for any resulting delay in his own performance; and

(2) May also either proceed to perform in any reasonable manner or after the time for a material part of his own performance treat the failure to specify

or to cooperate as a breach by failure to deliver or accept the goods.

We conclude that Melvin had an obligation to cooperate with Cole if his cooperation was necessary for Cole's performance.

On October 1, 1974, Cole was waiting in Canada for a reply to his letter wherein he made inquiry as to whether or not Melvin was planning on accepting the heifers. Because he had written the letter on September 8, we assume Cole had expected a reply for quite some time. Now, we have previously found that the failure to answer the letter is no ground for finding an anticipatory breach, but we will not cast aside the letter as having no legal significance whatever. The failure to respond to Cole's good faith inquiry respecting Melvin's intent to perform is, all else aside, a demonstration of the fact that Melvin was not one bit interested in cooperating.

■ Following Melvin's argument we would put Cole in the following predicament: Cole would have been obligated to load his heifers and haul them off to the nearest port of entry with no indication that Melvin would be there, and under circumstances giving rise to the reasonable inference that Melvin did not intend to come. We will not require that type of futile activity with the attendant risks and costs to the seller. Cole was justified in declining to haul the heifers to Portal, North Dakota, when he quite sensibly believed that Melvin would decline to pick them up. Cole was likewise excused for any delay in his own performance.

■ The telephone call of October 8, 1975, was a sufficient tender. Cole had eleven (11) pregnant heifers (conforming goods), and he made every reasonable effort to put and hold them at Melvin's disposition. He gave reasonable notice to enable Melvin to take delivery. If Melvin had cooperated and met Cole at the agreed upon place of tender, then Cole, without any doubt, would have handed over eleven (11) heifers safe in calf.

C. *Specific findings.*

The Court finds and concludes as follows:

1. On or before September 8, 1974, Cole became apprehensive about Melvin's willingness to perform.

2. The record reveals no reasonable grounds for Cole's apparent feeling of insecurity.

3. Melvin's failure to reply to Cole's inquiries by October 1, 1974, was *not* an anticipatory breach.

4. Melvin's failure to respond to Cole's inquiries was a legal justification for Cole's slight delay in tendering the heifers, and was also a legal justification for Cole's failure to haul the heifers to a port of entry.

5. Cole's tender was adequate.

6. Melvin breached the contract by refusing to cooperate and by refusing to accept conforming goods.

## IV.

A. *What is the proper measure of damages?*

The catalogue of a seller's remedies in a breach of contract case is found in S.D.C.L. § 57–8–5 (2–703). In the present case, the catalogue of available remedies can speedily be reduced to two;[7] these are:

(1) resale and recovery under S.D.C.L. § 57–8–14 (2–706(1)), or

(2) recovery of the difference between contract price and market price under S.D.C.L. § 57–8–22 (2–708(1)).

Plaintiff did indeed resell the heifers except for one that died while calving. To take advantage of the remedy embodied in S.D.C.L. § 57–8–14 (2–706(1)),

however, the seller must establish that the sale was "commercially reasonable". In addition, when the resale is at a public sale, the seller must give the buyer reasonable notice of the time and place of the sale. If the resale is private, the seller must give the buyer reasonable notification of his intention to resell.

Cole sold some of the heifers publicly and some privately (Tr. 19). As far as we know from the record, he did not give Melvin any notice about his intentions to resell at a specific time and place. This lack of notice obviates the need to delve into considerations of commercial "reasonableness"—especially the problematic questions about the time of resale.[8] We can summarily conclude that the difference between resale price and contract price as a measure of damages must be rejected. Plaintiff's course of action subsequent to the breach (failure to comply with code provisions concerning resale) precludes application of the contract/resale price differential as a formula for calculation of damages.

That leaves us with the time-honored contract/market price differential as a formula for calculating monetary damages. S.D.C.L. § 57–8–22 (2–708(1)) states:

> Subject to § 57–8–23 and to the provisions of this chapter with respect to proof of market price (§§ 57–8–57 to 57–8–59, inclusive), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this chapter (§ 57–8–27), but less expenses

---

**7.** At first glance it would appear an action for the total price under S.D.C.L. § 57–709(1)) would have been possible as that subsection does permit a seller to recover the price of goods identified to the contract if the seller can prove that the goods were not resalable at any reasonable price after a reasonable effort or when circumstances reasonably indicate that efforts to resell would be futile. *See* White and Summers, *supra,* at § 7–5. In this case, however, the evidence showed that there *was* a market for exotic cattle in the autumn of

1974 even though that market was plummeting. Thus, Plaintiff's counsel quite properly disregarded an action for the price because the remedy available in theory could not have been supported by the evidence.

**8.** This matter of a commercially reasonable time for resale is especially problematic due to the fact that resale without papers was no doubt impractical, maybe impossible at a decent price.

saved in consequence of the buyer's breach.

Plaintiff's counsel having urged the Court to consider this section, and it appearing that this section is applicable to the circumstances of this case, damages will be calculated by reference to this traditional formula.

The first problem to resolve in applying the formula is settling upon the market price "at the time and place of tender." As noted, *supra*, the time for tender was October 1, 1974, and the place of tender was Portal, North Dakota. We have no evidence by which we could establish with reasonable certainty what the market price was at the place of tender, and the evidence we have as to market price in other places at the time of tender is scanty.

■ The best way out of the dilemma seems to be the application of the alternative means of calculating market price as provided for in S.D.C.L. § 57–8–58 (2–723(2)); the subsection states:

> If evidence of a price prevailing at the times or places described in chapters 57–2 to 57–8, inclusive, is not readily available the price prevailing within any reasonable time before or after the time described at·or any other place which in commercial judgment or under usage of trade would serve as a reasonable substitute for the one described may be used, making any proper allowance for the cost of transporting the goods to or from such other place.

The best we can do in the present case is to use this provision, and by the principle therein provided, search the record for evidence of the prevailing price of similar cattle at other locations at a time reasonably near the time of tender.

Mr. Royale Runge, a long-time rancher who presently lives near Blunt, South Dakota, was called by plaintiff to testify about the market price of exotic cattle in 1974 and 1975. Mr. Runge testified that he had attended a considerable number of sales in recent years where exotic cattle were traded and that he had dealt with Blonde D'Aquitaine cattle. His testimony must be considered carefully.

Mr. Runge attended a cattle sale in Denver, Colorado, in January of 1975. Prices of exotic cattle sold at that time and place are recorded in Exhibit 7. Conceding that the range of prices paid for different animals was very great ($500–$7,000), we nevertheless give some weight to Mr. Runge's estimate that the average price was $2,200. (Tr. 74.) Obviously, given the variety of factors that influence the market price of any animal, this figure itself cannot be determinative of the market price of the heifers Cole had in his possession on October 11, 1974. Mr. Runge's statements do, however, give us some means of assessing the credibility of Cole's statements.

■ Cole testified that the price for a heifer of the type herein involved at markets known to him was between $2,000 and $2,500 on October 1, 1974. (Tr. 18.) On cross-examination he stated that he had attended "quite a few of the sales," and "that's what some of them were bringing." (Tr. 62.) He attended at least one sale at Estevan, Saskatchewan. While the record is pretty thin at this point, we must give some credence to Cole's figures because Runge agreed that $2,500 sounds "reasonably close." (Tr. 77).

Although this Court regrets that the record does not contain more evidence for calculation of damages, the Court believes that the record does substantiate the following findings which are hereby made with specificity:

1. The market price for the time and place of tender is not available;

2. In view of the commercial setting, other markets in Saskatchewan or nearby provinces and in nearby states of the U.S.A. are commercially reasonable substitute markets;

3. The market price of heifers similar to the heifers in question was $2,500 on October 1, 1974.

B. *Is Cole entitled to any incidental damages?*

■ According to S.D.C.L. § 57–8–22 (2–708(1)), when the contract/market dif-

ferential is used as a measure of damages, the seller is also entitled to incidental damages as provided by S.D.C.L. § 57–8–27 (2–710) less expenses saved in consequence of the buyer's breach. S.D.C.L. § 57–8–27 (2–710) states:

> Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in transportation, care and custody of the goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

Thus, expenses incurred after the point in time at which the market price is established for purposes of calculating damages (time of tender) can be added to the aggrieved seller's damages if such expenses are commercially reasonable.

The costs incurred for care and custody of goods after the buyer's breach are legitimately included as damages if such costs arise in connection with resale or otherwise result from the breach. Cole kept the heifers (goods) in his care and custody long after the breach, and in so doing he incurred the expenses of providing feed and shelter. He would not have been required to do so except for the breach; moreover, he had to keep them alive and healthy in some manner until some disposition could be made. We conclude that the expense of caring for the heifers may properly be added to the damages if the standard of commercial reasonableness is met.

■ Cole testified that he was familiar with the prices that custom feed lots charged to provide feed and shelter for cattle back in 1974. (Tr. 26–27). He stated that custom feed lots charged from a low of $1.25 per animal per day to a high of $3.00 to $4.00 per day, depending obviously on what type of a feeding program was involved. Because he could grow his own grain, Cole was able to feed and shelter the heifers for $1.00 per heifer per day, according to his testimony. While we wish there

was more proof on this point, the record does appear complete enough to justify a finding that $1.00 per heifer per day is a reasonably certain figure to use for the cost of custody and care of the heifers; hence, incidental damages can be calculated from that starting point.

The next question is what time period can properly be used to calculate the incidental damages. Breach occurred on October 8, 1974. Cole sold the heifers in early 1976. The Court must decide whether that entire period or a fraction thereof is properly used as a time-frame for the award of incidental damages.

■ One of the eleven heifers which was safe in calf on October 1, 1974, died on May 7, 1975, while calving. For that particular animal the care and custody costs could not possibly run for longer than the period from October 8, 1974, to May 7, 1975. With the other heifers, the situation is more complicated.

We do not believe that commercial reasonableness is broad enough to cover the entire span of time for the date of breach to the dates of sale.[9] The problem is finding the cut-off date when commercial reasonableness ends. Some rationale for establishing a cut-off point must be found in order to avoid being arbitrary.

The key is the registration papers. Cole testified that it was necessary for him to feed and shelter the animals until the registration papers arrived because he could not sell the heifers as Blonde D'Aquitaines without the papers. (Tr. 27.) We find him credible, at least insofar as public auctions are concerned.

■ The papers did not arrive until August of 1975. Because we have not been supplied with a date in August, we will be content to give Melvin the benefit of the doubt and use August 1, 1975, as the date the registration papers finally got to Canada. By one reckoning the time span for measuring costs for care and custody ex-

---

**9.** Seven (7) heifers were sold on January 23, 1976; seven (7) were sold on January 28; one (1) was sold on some unspecified day. (Ex. 5.)

tends from October 8, 1974, to August 1, 1975 for the heifers. The time of care and custody for the one which died is from October 8, 1974 to May 7, 1975. The Court believes that it was commercially reasonable to hold the heifers and care for them until such time as the best available disposition was at least possible, and under the circumstances this required possession of the recordation papers.

We are cognizant of the fact that Cole bought the heifers privately and waited for the papers. Melvin had previously purchased them privately and was waiting for the papers when he sold to Cole. Private sales *were* made without registration papers. But, the fact remains that the market in late 1974 was crashing downward; we think it a fair inference that private sales at a decent price were then very difficult to arrange; and we note that Cole especially asked for the registration papers in his letter of September 8, 1974. We conclude that it was commercially reasonable under all of the circumstances (without benefit of hindsight) to wait for the papers and to care for the cattle during that period of time.

The Court finds and concludes:

1. Cole kept and cared for ten heifers for 296 days after breach and before the registration papers arrived.

2. Cole kept and cared for one heifer for 211 days after breach and before she died.

3. One dollar per heifer per day was the cost of care and custody.

4. The total number of "heifer-days" is 10 times 296 plus 211, which equals 3,171.

5. Incidental damages within the purview of S.D.C.L. § 57–8–22 (2–708(1)) equal $3,171.00.

### V.

The Court having made findings and conclusions, and having further discussed the reasons underlying the application of certain sections of the U.C.C., there now remain two matters that merit a brief comment.

S.D.C.L. § 57–1–29 (1–106) states:

The remedies provided in this title shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this title or by other rule of law.

We have attempted to administer the remedies provided for in the U.C.C. with reasonableness and with attention to the goal of putting the aggrieved party (Cole) in as good a position as he would have been had Melvin performed.

Yet, a casual observer will be able to tell that Cole is not coming out nearly as well as if Melvin had performed. Using the contract/market differential he will get $16,500.00 plus the $3,171.00 awarded as incidental damages. This will give Cole a total of $19,671.00. Cole testified at trial that he sold the sixteen heifers for about $7,000.00 after having paid $49,000.00. From Exhibit 5 it appears to us that he did even worse than that, i. e. fourteen of the Blondes were sold for $3,296.00, and one was sold for meat at some unknown price.

Given the fact that the eleven heifers which were in calf as of October 1, 1974, had cost approximately $3,000.00 each and the fact that they were eventually disposed of for less than $500.00 each (using the evidence indicating the $7,000 disposition), Cole lost at least $27,500.00 plus the cost of care after August 1, 1975. In short, there is no way that we can realistically say that the remedial goal of reinstating the aggrieved party, into the position he would have occupied but for the breach, has been reached. The question arises whether this is really the result which the law provides where the particular code sections deemed relevant are applied.

After considerable deliberation it does appear that this result is precisely what the U.C.C. provides under the circumstances of this case. When breach occurred, Cole had two possibilities: (1) sell in a commercially reasonable manner and get damages with reference to the resale price,

or (2) rely upon the contract/market differential. From Cole's story it really seems as if he wanted to make a commercially reasonable resale as soon as possible; otherwise, he would not have asked for the papers as early as September 8, 1974. If he had received the papers promptly and had complied with the notice requirements of the code prior to resale, he would have come out much better. Cole did not receive the papers promptly and could not make a speedy resale; thus, his plan to dispose of the cattle in a commercially reasonable manner was foiled in part by Melvin's delay.

■ If it were only Melvin's delay that caused a resale which was not in harmony with the provisions of the code, this Court would seriously consider using the actual resale price as a measure of damages. In other words, even if Cole had sold as late as August or September of 1975, the sale *might* have arguably fallen within the concept of "commercial reasonableness." But, with the extended delay beyond the receipt of the papers and with the failure to comply with the code's requirements for notice on resale, it cannot be said that Melvin's delay alone caused a resale which was less than commercially reasonable. Cole forfeited the right to use resale price as a measure of damages and was left with the contract/market differential which can arguably be viewed as a statutorily imposed liquidated damages clause. *See* White and Summers, *supra*, § 7–12.

■ The contract/market formula embodied in S.D.C.L. § 57–8–22 (2–708(1)) is supplemented by S.D.C.L. § 57–8–23 (2–708(2)) which provides:

> If the measure of damages provided in § 57–8–22 is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this chapter (§ 57–8–27), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

We must consider whether or not this is a gateway through which plaintiff can go to obtain recovery of his entire economic injury.

White and Summers discuss the applicability of this section in detail in § 7–9 through § 7–11 of their treatise cited, *supra*. As they demonstrate, there is little doubt that "lost volume sellers," component manufacturers and "jobbers" can take advantage of the supplementary remedy of S.D.C.L. § 57–8–23 (2–708(2)). There is much doubt about the proper treatment of a plaintiff who is not a lost volume seller, etc.

White and Summers argue that someone in Cole's position (not a lost volume seller, component manufacturer or jobber) should be allowed to prove up damages beyond the contract/market differential and incidental damages. They state:

> [W]e believe that any plaintiff who is hardy enough to prove that the 2–708(1) measure of damages will not put him in the same position performance would have, should be permitted to prove what performance would have done for him and should recover that amount under 2–708(2). We take that position with a healthy respect for the problems it poses for the plaintiff and the court. White and Summers, *supra*, § 7–11 at 229.

In addition to problems of proof (we do not know what to believe as to the exact resale price), this idea is objectionable in the present case for two reasons. First, the notice requirements for a commercially reasonable resale would be rendered superfluous. A person in Cole's position would have nothing to gain by complying with the code and nothing to lose by failing to comply. Second, the measure of damages would have little to do with lost "profit" which appears to be the thrust of S.D.C.L. § 57–8–23 (2–708(2); rather, we would be stretching and bending the law to compensate a seller who had problems in getting back his initial investment due to a wildly fluctuating market.

If the state legislature thinks that plaintiffs in Cole's position ought to have full recovery for economic injury suffered, then they can invent a remedy. As the law stands now, state law does not require that anything more than the contract/market differential plus incidental damages should be awarded in these circumstances, and we are content to let the matter rest there.

 The final question presented for our consideration is whether or not an award of pre-judgment interest is in order pursuant to S.D.C.L. § 21–1–11. An extensive discussion of South Dakota law on the subject is contained in *Peter Kiewit Sons Co. v. Summit Construction Co.*, 422 F.2d 242 (8th Cir. 1969). On the basis of the discussion in that case and the South Dakota case law upon which the appellate court relied, we believe that pre-judgment interest should be awarded when the following conditions are met:

(1) The plaintiff is entitled to recover a sum certain, or damages that can be made certain by calculation;

(2) The right to recover is vested in the plaintiff on a particular day;

(3) The debtor is not prevented by the plaintiff or by law from paying the debt.

If these three conditions are present, then pre-judgment interest is properly awarded even though the claim may have been hotly disputed. *Beka v. Lithium Corporation of America*, 77 S.D. 370, 92 N.W.2d 156 (1958). Thus, the test for awarding interest is not whether liability was clear, but whether (assuming liability) the damages were reasonably ascertainable by reference to prevailing markets. According to the *Beka* case:

> The reason for denying interest on a claim is that where the person liable does not know what sum he owes, he cannot be in default for not paying. *Beka, supra*, at 159–160.

Logically, one might well complain that if he could not be in default for not knowing what he owes, he assuredly ought not be held liable for interest when he in good faith does not know if the law will require him to pay anything. Nevertheless, it appears to be the law in South Dakota that a plaintiff in Cole's position is entitled to pre-judgment interest.

Interest on the contract/market difference ($16,500.00) will be calculated from October 8, 1974, until the date of judgment at the rate of 6% per annum. Interest on the incidental damages will be calculated from August 1, 1974, until the date of judgment.

The foregoing opinion contains this Court's findings of fact and conclusions of law and shall constitute the same.