971 F.2d 103
 23 Fed.R.Serv.3d 546
 Frederick A. SIMEONE, M.D., Appellant,
v.
FIRST BANK NATIONAL ASSOCIATION, also known as First
National Bank of St. Paul; Antje Angela Quante,
Executrix of the Estate of Herman
Quante; Leland Gohlike;
Peter Garretson; Appellees.
 No. 91-1629.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 14, 1991.
Decided July 24, 1992.
 
 Paul A. Lauricella, Philadelphia, Pa., argued (James E. Beasley, on the brief), for appellant.
 Scott A. Johnson, Wayzata, Minn., and Michael A. Stern, Minneapolis, Minn., argued for appellees.
 Before LAY,* Chief Judge, RICHARD S. ARNOLD,** Circuit Judge, and STUART,*** Senior District Judge.
 LAY, Chief Judge.
 
 
 1
 Frederick A. Simeone appeals the district court's grant of summary judgment in favor of First Bank National Association (First Bank), Antje Angela Quante, the Executrix of the Estate of Herman Quante (the Estate), Leland Gohlike, and Peter Garretson. The litigation arises from a purchase agreement between Simeone, First Bank and the Estate relating to the purchase of certain classic automobiles and parts. Upon First Bank's and the Estate's refusal to perform under the contract, Simeone brought suit for breach of contract, fraud and misrepresentation, tortious interference with a contract, breach of fiduciary duty, and conspiracy. Upon review, we vacate the district court's order granting summary judgment.[1]
 
 I. BACKGROUND
 
 2
 On July 1, 1985, following a determination that Leland Gohlike and Gohlike Brothers, Inc. had defaulted on certain obligations to First Bank, the Minnesota District Court for Washington County entered an order directing the county sheriff to seize from Gohlike's possession certain property in which First Bank possessed a security interest. This property included a number of classic automobiles and parts. The court further authorized First Bank to sell such property and ordered Gohlike and his company "enjoined, restrained and prevented from operating, moving, leasing, selling, disposing, using, encumbering, selling in the ordinary course of business, mortgaging, pledging or otherwise adversely affecting the Collateral interest of claimant in said Collateral." The First Nat'l Bank of St. Paul v. Leland Gohlike and Gohlike Bros., No. C1-85-670 (Minn.Dist.Ct. July 1, 1985).
 
 
 3
 On October 26, 1985, First Bank and the Estate[2] entered into a contract with Simeone to convey the automobiles and parts for $450,000. The contract required Simeone immediately to assume the risk of loss on the property, and to tender ten percent of the purchase price. The contract set forth two conditions which would terminate the immediate obligation to convey title and interest in the automobiles and parts:
 
 
 4
 [U]nless either (a) the Bank determines that it is precluded from performing in accordance herewith by order, stay, pending action, regulation, injunction or the filing of notice of federal tax lien without satisfaction of additional conditions, or (b) Gohlike pays to the Bank and the estate on or before November 4, 1985, cash in excess of the Purchase Price set forth in Section 2 hereof, and prior to that date Gohlike delivers to the Bank as well as its officers, directors and agents a release of the Bank by the Estate as well as a release of the Bank, its officers, directors and agents by Gohlike acceptable to the Bank, the Bank and the Estate will convey to the Purchaser on November 4, 1985, all of their right, title and interest in the Conveyed Assets....
 
 
 5
 Jt.App. at 89. Simeone claims that First Bank representatives advised him that Gohlike had been enjoined from interfering with the disposition of the property, and that Gohlike's only means of preventing the conveyance would be to tender an amount greater than the purchase price. Three days before this agreement was executed, however, Gohlike initiated an action in federal court against First Bank and its officers alleging, inter alia, violations of his civil rights.
 
 
 6
 On October 28, 1985, First Bank wrote to Gohlike's attorney informing him of the purchase agreement and advising him of the agreement's provision of "one additional opportunity for the Debtor [Gohlike]" to buy back the cars and parts. Jt.App. at 103. The letter further indicated that First Bank would view any attempt to interfere with its disposition of the collateral as a direct violation of court orders, but suggested that if Gohlike disagreed he was "free to bring a motion in Washington County District Court seeking to amend these orders." Id. at 104. On November 4, 1985, the date set for the conveyance of title to Simeone, Gohlike obtained from the Washington County District Court an ex parte temporary restraining order (TRO) preventing the sale of the collateral. Thereafter, First Bank and the Estate refused Simeone's proffered tender of the balance of the purchase price.
 
 
 7
 On November 5, 1985, according to Simeone, First Bank officer Peter Garretson informed him that First Bank was prepared to fight the TRO, and that it expected the TRO to be vacated and the purchase agreement to proceed. On November 6, 1985, a First Bank representative appeared before the Washington County District Court and moved to vacate the TRO; a hearing on the Bank's objections was set for November 12, 1985.
 
 
 8
 Sometime on or before November 8, 1985, without Simeone's knowledge, First Bank entered into negotiations with Gohlike and James Torseth, a neighbor of Gohlike's, to sell the automobiles and parts to Torseth in exchange for Gohlike's dismissal of his federal district court suit against the Bank and its officers and a purchase price by Torseth slightly in excess of Simeone's. On November 9, 1985, First Bank's attorney informed Simeone over the telephone that the Bank was concerned about the nuisance value of Gohlike's suit against it and its officers, and was considering selling the automobiles and parts to Torseth.
 
 
 9
 At the November 12, 1985 hearing First Bank and the Estate presented the court with a proposed order directing First Bank to convey the collateral to SMB, Inc. (Torseth), directing Gohlike to dismiss his action against First Bank and its officers, and vacating the TRO. The court approved the proposed order over the objections of Simeone's attorney. First Bank returned Simeone's $45,000 in April of 1986.
 
 
 10
 Simeone commenced legal proceedings in Minnesota state court on December 19, 1985. Simeone later moved to dismiss the state court proceedings, and the court permitted Simeone to dismiss his actions without prejudice. Simeone then filed the present action in federal district court on October 20, 1988. The defendants moved for an award of fees and costs associated with the state proceedings pursuant to Federal Rule of Civil Procedure 41(d). On March 31, 1989, the United States District Court for the District of Minnesota granted this motion and ordered Simeone to pay defendants $13,922.97 in state court costs, including $11,550 in expert witness fees.
 
 
 11
 Upon defendants' motion, the federal court entered summary judgment in favor of defendants on August 22, 1989. Simeone appeals.II. CONTRACT INTERPRETATION
 
 
 12
 The district court determined that the contract between Simeone, First Bank, and the Estate set forth two conditions precedent to First Bank's and the Estate's duty to convey to Simeone their title and interest in the collateral. It further found that because the Bank and the Estate were precluded by court order from conveying the collateral to Simeone on November 4, 1985, the Bank's and the Estate's obligations under the contract were terminated. We must respectfully disagree.
 
 
 13
 The interpretation of a contract presents a question of law. Hibbs v. K-Mart Corp., 870 F.2d 435, 438 (8th Cir.1989). On appeal, we decide the case de novo. The terms of the contract should be construed by their plain meaning. See, e.g., Turner v. Alpha Phi Sorority House, 276 N.W.2d 63, 67 (Minn.1979); Employers Mut. Liab. Ins. Co. v. Eagles Lodge, 282 Minn. 477, 479, 165 N.W.2d 554, 556 (1969); Bobich v. Oja, 258 Minn. 287, 294, 104 N.W.2d 19, 24 (1960). We deem the contract executed on October 26, 1985, as unambiguous, establishing a binding agreement between the parties. There should be little question that the contract was binding and effective between the parties at the time of execution. The contract provided in part: "this Agreement shall constitute a binding contract for the disposition of the Conveyed Assets enforceable as between the Bank[, the Estate,] and the Purchaser upon execution of this Agreement by the Bank[, the Estate,] and the Purchaser...." Jt.App. at 92 (emphasis added). The contract required Simeone to perform some of his obligations under the contract immediately upon signing, such as assuming risk of loss and tendering a portion of the purchase price. The contract also established a date on which the Bank and the Estate were obligated to convey title and interest in the collateral to Simeone, and the date on which Simeone was required to tender the balance of the purchase price. The Bank's and the Estate's obligations to convey title on that date, however, could be excused if either of two events occurred. Under these circumstances, we read the contract as establishing conditions which might excuse the Bank's and the Estate's obligations to convey title on November 4, 1985, the date specified by the contract. See Restatement (Second) of Contracts § 230(1) (1981) ("if under the terms of the contract the occurrence of an event is to terminate an obligor's duty of immediate performance ... that duty is discharged if the event occurs.").[3]
 
 
 14
 The express terms of the contract make clear that the existence of the TRO on November 4, 1985, one of the two conditions, did not serve as an event which would terminate all rights and obligations under the contract itself; it merely excused the Bank's and the Estate's failure to convey the title to the collateral on that date. See Samuel Williston, 5 Williston on Contracts 147-48 (Walter H.E. Jaeger ed., 3d ed. 1961) (discussing "distinction between condition subsequent to the existence of the contract and a condition subsequent to the duty of immediate performance of a promise therein."). In other words, we deem it clear that the contract provided that if either a court order or Gohlike's proffer of releases and an appropriate purchase price prevented the Bank and the Estate from conveying title to Simeone on November 4, 1985, no action for breach of contract would lie for the Bank's and the Estate's failure to convey title on November 4, 1985. It is true that if Gohlike proffered an appropriate amount and the releases by November 4, 1985, the Bank and the Estate would be relieved permanently from the duty to convey the collateral to Simeone.[4] The temporary nature of the court order preventing conveyance on November 4th, however, did not preclude performance under the contract at a reasonable later date. We find this interpretation of the contract supported by both general contract principles and the apparent intention of the parties as evidenced by other provisions of the contract.
 
 
 15
 First, it is fundamental that an interpretation of a contract which results in termination of the contract is disfavored over one which affirms the existence of the contract. Cf. 4 Williston on Contracts at 748 ("an interpretation which renders the contract or agreement valid and its performance possible will be preferred to one which makes it void or its performance impossible or meaningless...."). Further, an interpretation which is fair and reasonable to both parties is preferred over a harsh one. See id. at 751 ("[T]he most fair and reasonable construction, imputing the least hardship on either of the contracting parties, should be adopted, so that neither will have an unfair or unreasonable advantage over the other.") (quoting Tessmar v. Grosner, 23 N.J. 193, 201, 128 A.2d 467, 471 (1957) (citations omitted)); Arthur L. Corbin, 3 Corbin on Contracts 210 (1960); Employers Mut. Liability Ins. Co. v. Eagles Lodge, 282 Minn. 477, 479-80, 165 N.W.2d 554, 556 (1969) (terms will not be so strictly construed as to lead to harsh result); Burnett v. Hopwood, 187 Minn. 7, 18, 244 N.W. 254, 258 (1932); Restatement (Second) of Contracts § 203(a). In this case, the interpretation asserted by defendants would terminate their duty to perform under the contract even where the court order was merely a temporary injunction, and where First Bank officers assured Simeone the order could be easily vacated. Moreover, contract provisions should be interpreted most strongly against the party who drafted the agreement, see 4 Williston on Contracts § 621; Turner v. Alpha Phi Sorority House, 276 N.W.2d 63, 66 (Minn.1979); Beattie v. Product Design & Eng'g, 293 Minn. 139, 149, 198 N.W.2d 139, 144 (1972), in this case First Bank and the Estate.
 
 
 16
 Other provisions of the contract indicate that time was not of the essence to the parties. There is absolutely no evidence in the contract that Simeone desired conveyance of title on November 4, 1985, or not at all. In fact, the parties contemplated that conveyance of title could take place at a later time to be agreed upon in writing by the parties. See, e.g., Jt.App. at 89 (purchaser will pay to the Bank $355,000 "on November 4, 1985 or such later date as the Bank and the Purchaser may agree in writing."); id. at 92 (bills of sale "shall be delivered and transfer of title shall occur on November 4, 1985 or such later date as the parties hereto may agree in writing."). While it is true that the parties anticipated the event which actually occurred, Gohlike's procurance of a court order preventing the conveyance on the agreed upon date, there is no indication that the parties intended such an event to terminate all rights and responsibilities under the contract rather than to merely delay the conveyance.
 
 III. AWARD OF COSTS UNDER FRCP 41(d)
 
 17
 Simeone challenges the district court's order awarding defendants costs related to the state court action pursuant to Federal Rule of Civil Procedure 41(d). That rule provides:
 
 
 18
 If a plaintiff who has once dismissed an action in any court commences an action based upon or including the same claim against the same defendant, the court may make such order for the payment of costs of the action previously dismissed as it may deem proper and may stay the proceedings in the action until the plaintiff has complied with the order.
 
 
 19
 Simeone claims that the award of $11,550 in defendants' expert witness fees runs afoul of the Supreme Court's decision in Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). In Crawford, the Court held that where a prevailing party is awarded costs under Rule 54(d), the costs of expert witnesses may be reimbursed only to the extent provided for in 28 U.S.C. § 1821 (1988) and 28 U.S.C. § 1920 (1988). Id. at 445, 107 S.Ct. at 2499.
 
 
 20
 The district court held Crawford inapplicable to costs awarded pursuant to Rule 41(d). It reasoned that costs under Rule 54(d) are awarded as a matter of course to the prevailing party, and the uniformity obtained by application of Sections 1821 and 1920 was therefore desirable. Costs awarded under Rule 41(d), however, are intended to serve as a deterrent to forum shopping and vexatious litigation. See James W. Moore et al., 5 Moore's Federal Practice p 41.16 (2d ed. 1992).
 
 
 21
 We need not decide whether Crawford applies to awards under Rule 41(d) in this case because this case concerns a prior state court proceeding, not a federal court proceeding wherein expert witness costs might be limited by Sections 1821 and 1920. Minnesota does not limit the award of expert witness costs. See Minn.Stat. § 357.25 (Supp.1991); Minn.Stat. § 549.21 (Supp.1991); Peterson v. City of Elk River, 312 N.W.2d 243, 246 (Minn.1981); Dahlbeck v. DICO Co., 355 N.W.2d 157 (Minn.Ct.App.1984) (awarding almost $13,000 in expert witness fees).
 
 
 22
 We therefore affirm the district court's entire award of costs relating to Simeone's prior proceedings in Minnesota state courts.
 
 
 23
 The district court granted summary judgment on the various other causes of action, including fraud and tortious interference. We are in doubt as to whether its ultimate rulings on these counts was influenced by its erroneous interpretation of the contract itself. We therefore vacate the grant of summary judgment on each count and remand to the district court. The district court may wish to reinstate its ruling on the other counts, notwithstanding any reversal on the breach of contract claim. The district court thus should feel free to do so, as long as it is not influenced by its initial ruling on the breach of contract claim. Our ruling in this regard is without prejudice to either party to challenge the district court's ruling. We make clear that we do not at this time rule on the merits of these claims other than the breach of contract count.
 
 
 24
 Therefore, we vacate the summary judgment on all counts, but without prejudice to the district court to grant or deny summary judgment on all counts, with the exception of the breach of contract claim.
 
 
 
 *
 The HONORABLE DONALD P. LAY was Chief Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status on January 7, 1992, before the opinion was filed
 
 
 **
 The HONORABLE RICHARD S. ARNOLD became Chief Judge of the United States Court of Appeals for the Eighth Circuit on January 7, 1992
 
 
 ***
 The HONORABLE WILLIAM C. STUART, Senior United States District Judge for the Southern District of Iowa, sitting by designation
 
 
 [1]
 Simeone also appeals the district court's order awarding defendants fees and costs associated with a previous state court proceeding initiated by Simeone and dismissed without prejudice. We affirm the district court on this issue
 
 
 [2]
 Some of the classic automobile parts in Gohlike's possession were owned by the Estate
 
 
 [3]
 Although the district court finds the disputed conditions of the contract to be "conditions precedent" and Simeone urges that the conditions are "conditions subsequent," we note the general consensus that the distinction between conditions precedent and subsequent has little substantive meaning. As one scholar of contract law cogently observed:
 A fact is a condition precedent to the legal relation for the creation of which it is necessary. A fact is a condition subsequent to the legal relation that it extinguishes. It is evident that the same fact is a condition precedent to one legal relation, ... while it is a condition subsequent to another. Therefore, before it can be described as either precedent or subsequent, it is necessary to know the particular legal relation with respect to which it is being considered.
 Arthur L. Corbin, 3A Corbin on Contracts 442 (1960); see also E. Allan Farnsworth, Contracts 542 (1982) ("The main impact of this distinction between conditions precedent and subsequent has come, not in the law of contracts as such, but in the law of procedure."). The Restatement of Contracts has abandoned entirely the use of the two terms. See Restatement (Second) of Contracts § 224 reporter's note (1981).
 
 
 [4]
 The occurrence of such an event would, of course, not only make the conveyance impossible to carry out, but would also make the contract itself impossible to perform. This situation would not occur upon the issuance of a temporary restraining order