_____

No. 94-3666
No. 94-3787

_____

Frederick A. Simeone,       *
                                    *
     Appellee/Cross Appellant,   *
                                    *
       v.                        * Appeals from the United States
                                    * District Court for the District
First Bank National         * of Minnesota.
Association, formerly know as   *
First Natl. Bank of St. Paul;   *
                                    *
     Appellant/Cross Appellee,   *
                                    *
Antje Angela Quante, Executrix  *
of the Estate of Herman Quante;  *
Leland Gohlike,           *
                                    *
     Defendants,            *
                                    *
Peter Garretson,          *
                                    *
     Appellant.             *

_____

Submitted:  June 16, 1995

Filed:  January 3, 1996

_____

Before BEAM, ROSS and MURPHY, Circuit Judges.

_____

ROSS, Circuit Judge.


     Appellant, Frederick Simeone, sought damages against appellee
First Bank National Association (First Bank) and others for breach
of contract and fraud stemming from an agreement by First Bank to
sell Simeone 1920-1930 era vintage Mercedes-Benz automobiles and
parts which had been repossessed from a defaulting loan customer,

Leland Gohlike.  We affirm in part and reverse in part.

I.

The vehicles in question included a one-of-a-kind 1929 Mercedes Benz SS Roadster, two 1930 era Mercedes Benz Roadsters (of which a total of 114 were ever manufactured), and a 1928 Mercedes Benz SSK (one of only 39 ever manufactured), which had been owned by the son of Sir Arthur Conan-Doyle, the creator of Sherlock Holmes.  Additionally, there were thousands of loose parts, including shock absorbers, fenders, seat cushions and wheels, which were no longer manufactured and which were themselves extraordinarily rare.  One of the automobiles and some of the parts repossessed from Gohlike were allegedly owned by the Estate of Herman Quante (Quante Estate).  While First Bank never acknowledged the Estate's claim of ownership, it nonetheless agreed to pay the Estate $50,000 for its interest, if any.

On October 26, 1985, after receiving inquiries from several other potential purchasers, First Bank entered into an agreement to sell the repossessed automobiles and parts for $400,000 to Simeone, a self-described collector of vintage automobiles.  In the same agreement, Simeone agreed to purchase the Quante Estate car and parts for $50,000.  Simeone paid 10% of the contract price as a downpayment.

On November 4, 1985, the date set for the conveyance of title to Simeone, Leland Gohlike, the debtor, obtained a temporary restraining order (TRO) to prevent the sale of the collateral. Thereafter, First Bank refused Simeone's proffered tender of the balance of the purchase price. Prior to obtaining the TRO, Gohlike instituted a civil action against First Bank and its officers claiming a violation of due process and seeking $13,000,000 in damages.

Sometime on or before November 4, 1985, First Bank entered into negotiations with Gohlike and James Torseth, Gohlike's neighbor, to sell the automobiles and parts to Torseth in exchange for Gohlike's dismissal of his suit against the bank and a purchase price slightly in excess of Simeone's. Believing that it no longer had an obligation to sell the property to Simeone because of a condition in the agreement, First Bank subsequently sold the cars and parts to SMB, Inc., a corporation created by Torseth for the purchase and resale of the automobiles and parts, and Gohlike dismissed his suit against First Bank. SMB, Inc. later sold all of the cars and parts for $1,114,960, including $470,000 that Simeone himself paid for the purchase of the 1929 Mercedes Benz SS Roadster. Two experts at trial testified that, because of their rarity, by late 1987 or early 1988 the vehicles and parts were worth over three million dollars.

First Bank returned Simeone's downpayment with interest and Simeone filed suit alleging breach of contract and fraud. The district court granted summary judgment in favor of First Bank, finding that because a condition precedent was not satisfied, the sellers were not obligated by the contract. The Eighth Circuit subsequently vacated the summary judgment ruling, concluding that First Bank and the Estate had breached the contract by failing to convey the property to Simeone. Simeone v. First Bank Nat'l Ass'n, 971 F.2d 103, 106-07 (8th Cir. 1992). This court remanded the case to the district court for rulings on the other claims raised by Simeone, as well as an assessment of damages. Id. at 108.

Prior to trial on remand, Simeone agreed to dismiss the Quante Estate from the case with prejudice. The trial was conducted from February 28, 1994, through March 8, 1994. At the close of the breach of contract phase of the trial, the district court ruled as a matter of law that the Bank's conduct did not constitute fraud. However, the court permitted the fraud claim to be tried to the jury to forestall the necessity for a later trial in the event the

-3-

fraud dismissal was reversed on appeal.  The jury awarded Simeone $2,405,000 for breach of contract, including $585,000 in compensatory damages, $225,000 in incidental damages, and $1,595,000 in consequential damages, plus prejudgment interest.[1] The jury also awarded $1.00 on the court-dismissed fraud claim. The district court denied First Bank's motion for a new trial or, in the alternative, amendment of the judgment or remittitur pursuant to Fed. R. Civ. P. 59.

II.

In its challenge to the compensatory damages award, First Bank argues the district court erroneously allowed Simeone's experts to rely on the collector automobile market as the relevant market in appraising the fair market value of the vehicles and parts at the time of the breach.  Instead, First Bank contends the relevant market was the market of "repossessed goods in bank foreclosure sales."

Minn. Stat. § 336.2-713(1) provides the proper measure of damages for a seller's breach of contract:

> [T]he difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages. . . .

"Market price" "is the price for goods of the same kind and in the same branch of trade."  Minn. Stat. § 336.2-713, U.C.C. Comment 2. According to First Bank, the "branch of trade" in this case was the resale market of repossessed goods, not a collector automobile market.  The Uniform Commercial Code, as adopted in Minnesota,

_____

[1]In its special verdict form the jury set the market price of Gohlike's cars and parts at the time of the breach at $885,000 and the market price of the Quante Estate car and parts at the time of the breach at $150,000.

-4-

permits opinion evidence as to the value of the goods in question:

> Where the unavailability of a market price is caused by a scarcity of goods of the type involved . . . [s]uch scarcity conditions . . . indicate that the price has risen and under the section providing for liberal administration of remedies, <u>opinion evidence as to the value of the goods would be admissible in the absence of a market price</u> and a liberal construction of allowable consequential damages should also result.

Minn. Stat. § 336.2-713, U.C.C. Comment 3 (emphasis added).

At trial, the evidence showed that the vehicles were rare, and in some cases unique, classic automobiles of historic significance. The disassembled parts, as well, were scarce commodities. At trial an expert in vintage automobiles valued the cars and parts at $1,355,000 at the time of the breach. Based on the evidence presented at trial, the jury concluded that, at the time of the breach, the value of the property owned by First Bank was $885,000 and the value of the property owned by the Quante Estate was $150,000, or a total market value of $1,035,000. The difference between this fair market value and the $450,000 contract price is $585,000, the amount of compensatory damages awarded.

The district court did not abuse its discretion in permitting the valuation of the automobiles and parts based on a collector's market. The evidence clearly supports the jury's determination and the award of compensatory damages is affirmed.

III.

First Bank next raises several challenges to the consequential damages assessed against it. The jury awarded $1,595,000 in consequential damages, which was derived from expert testimony as to what the automobiles and parts were worth in late 1987, two years after the breach of contract, minus the market price of the

property at the time of the breach. First Bank now argues the evidence is insufficient to establish the foreseeability requirement to support the $1,595,000 consequential damages award.

Under Minnesota law, recoverable consequential damages include:

> [A]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise.

Minn. Stat. § 336.2-715(2)(a). Under this section, consequential damages are not available in every case, but instead are only proper if the seller had reason to foresee the particular requirements of the buyer, and even then only if such loss could not be prevented. The focus is on what the seller had reason to know. Minn. Stat. § 336.2-715; U.C.C. Comment 3.

According to First Bank, Simeone repeatedly stated prior to contract formation that he was not in the business of selling automobiles and parts and therefore First Bank neither knew nor had reason to know that Simeone intended to trade or resell the automobiles and parts at any profit, let alone a profit of $1,595,000. First Bank contends the award of consequential damages erroneously treats the agreement as one for the purchase of goods for resale when that was clearly not the case.

The question of whether the buyer's consequential damages were foreseeable by the seller is one of fact to be determined by the trier of fact. Franklin Mfg. Co. v. Union Pacific R.R., 248 N.W.2d 324, 326 (Minn. 1976). First Bank asks that this court conclude as a matter of law that the consequential damages were not foreseeable. We decline to so hold. Mr. Garretson, commercial banking officer of First Bank and acting on behalf of the Bank during the relevant negotiations with Simeone, testified that he

-6-

was aware that collectors may trade vehicles in order to enhance their collection. Further, Simeone testified he told First Bank's broker that he intended to use the cars and parts for trading or possible resale to obtain additional cars. Finally, Simeone contracted to purchase hundreds of automotive parts that the jury would reasonably presume would have to be either resold or assembled into something of increased value. The jury's determination that it was foreseeable that Simeone would seek to further his collection by engaging in sale or trade was not clearly erroneous.

Also with respect to consequential damages, First Bank argues the court erred in failing to adequately apply the doctrine of cover or mitigation of damages. First Bank claims that even if sufficient evidence existed to support an award of consequential damages under Minn. Stat. § 336.2-715(2)(a), such damages are only allowed to the extent that they "could not reasonably be prevented by cover or otherwise." This provision incorporates the common law policy that an aggrieved party has a duty to mitigate damages. See Barry & Sewall Indus. Supply Co. v. Metal-Prep of Houston, Inc., 912 F.2d 252, 259 (8th Cir. 1990).

"The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." Minn. Stat. § 336.2-712; U.C.C. Comment 2. The burden of proof rests with the seller to establish that the buyer acted unreasonably in failing to prevent his own loss. See Bemidji Sales Barn, Inc. v. Chatfield, 250 N.W.2d 185, 189 (Minn. 1977). Further, the duty to cover "does not require an injured party to take measures which are unreasonable or impractical or which require expenditures disproportionate to the loss sought to be avoided or which are beyond his financial means." Gerwin v. Southeastern Calif. Ass'n of Seventh Day Adventists, 92 Cal. Rptr. 111, 117 (Cal. Ct. App.

1971).

SMB, Inc. ultimately sold the automobiles and parts for $1,114,960. First Bank now contends that Simeone's consequential damages should be limited because he could have mitigated his damages by purchasing the vehicles and parts from SMB, Inc. at the increased price. The jury, however, rejected this argument. Although the evidence at trial showed that the automobiles and parts were for sale to the general public as soon as SMB, Inc. purchased them from First Bank, it is unreasonable to require that Simeone expend over $1,000,000, almost $700,000 more than the contract obligated him to pay, to purchase the cars and parts in order to effect cover and mitigate his loss. Indeed, First Bank made no showing at trial that Simeone even had such resources available to him or that it would be reasonable to require such cover. It is noteworthy that Simeone did, in fact, undertake efforts to effect cover when he ultimately purchased the 1929 SS Roadster from SMB, Inc. The purchase price of the Roadster exceeded that which Simeone had initially contracted to pay for all of the vehicles and parts. The suggestion that Simeone should have purchased the entire lot of automobiles and parts as a matter of law is not supported by the evidence.

Finally, First Bank contends the consequential damages award is too speculative as a matter of law to be the basis for recovery. Under Minnesota law, "[t]he controlling principle governing actions for damages is that damages which are speculative, remote, or conjectural are not recoverable." Leoni v. Bemis Co., Inc., 255 N.W.2d 824, 826 (Minn. 1977) (quotation omitted). However, a plaintiff's losses need not be proven with mathematical precision. "Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount." Id.

Here, two experts in antique and classic cars testified as to

-8-

the value of the vehicles and parts at the time of the breach as well as their appreciated value two years after the breach. This testimony was based on the expert's knowledge of the available market, the rate at which such unique cars appreciate in value because of their scarcity and desirability among collectors, as well as the prices commanded by comparable vehicles. This testimony provides a reasonable basis upon which to support the jury's determination of consequential damages.

IV.

First Bank next claims the district court erred in refusing to grant its motion for a new trial or in the alternative a remittitur because the evidence does not support the jury's award of incidental damages. Because we are reviewing state court claims, the appropriate standard for review is that applied by Minnesota appellate courts. Piekarski v. Home Owners Savings Bank, 956 F.2d 1484, 1488 (8th Cir. 1992) cert. denied, 113 S. Ct. 206 (1992). Thus, this court should uphold the trial court's denial of First Bank's new trial motion or motion for remittitur unless there has been a clear abuse of discretion. Johnson v. Washington County, 518 N.W.2d 594, 601 (Minn. 1994).

Under Minnesota law, incidental damages resulting from a seller's breach are defined as:

> [E]xpenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

Minn. Stat. § 336.2-715(1). See also Mattson v. Rochester Silo, Inc., 397 N.W.2d 909, 915 (Minn. Ct. App. 1987). In contrast to incidental damages, Minnesota law also provides that "the buyer may

'cover' by making in good faith and without unreasonable delay any reasonable purchase of . . . goods in substitution for those due from the seller." Minn. Stat. § 336.2-712(1). The buyer may recover from the seller as "cover damages" "the difference between the cost of cover and the contract price together with any incidental or consequential damages." Minn. Stat. § 336.2-712(2); Barbarossa & Sons, Inc. v. Iten Chevrolet, Inc., 265 N.W.2d 655, 661 (Minn. 1978).

Here, the jury awarded Simeone $225,000 in incidental damages. Simeone speculates that this amount represents his cost of cover in purchasing the 1929 SS Roadster ($470,000 purchase price minus $250,000 contract price, plus $5,000 for dismissal of SMB, Inc. from a civil action). Appellee's Brief at 31. However, the difference between the cost of cover and the contract price is not properly characterized as incidental damages. Rather, incidental damages are, among other things, the "charges," "expenses" and "commissions" incurred in effecting cover. Minn. Stat. § 336.2-715(1). In contrast, the award of damages for the difference between Simeone's purchase price of the Roadster and the contract price falls under Minn. Stat. § 336.2-712 as "cover" damages. The jury's award of incidental damages in this case represents a double recovery to the extent that it compensates Simeone for the difference between the contract price and the price he actually paid for the Roadster. Simeone was compensated for the difference between the contract price and the purchase price through both the compensatory and consequential damages awards. Since there is no other evidence of incidental damages, the award of incidental damages must be reversed.

V.

First Bank argues it should not be held accountable for the failure to convey the vehicle that had been claimed by the Quante Estate, the Conan-Doyle car. We do not agree. The contract,

-10-

drafted by First Bank, specifically provides that "this Agreement shall constitute a binding contract for the disposition of the Conveyed Assets enforceable as between the Bank and the Purchaser upon execution of this Agreement by the Bank and the Purchaser. . . ." (Emphasis added). Under the express terms of the contract, the phrase "Conveyed Assets" includes the assets claimed by the Quante Estate. The contract, therefore, provides that the agreed upon disposition of the Conan-Doyle car is enforceable as between the Bank and Simeone. Thus, under the express terms of the contract, Simeone can enforce his claim with respect to all the vehicles against First Bank.

Moreover, the contract provides that the automobiles and parts, including the Conan-Doyle car, would be conveyed to Simeone "unless . . . the Bank determines that it is precluded from performing." Under the express terms of the contract, the Estate could play no role in the decision to refrain from conveying the automobiles to Simeone.

It was First Bank that made the decision not to accept Simeone's wire transfer of the balance due under the contract on November 4, 1985. Further, it was First Bank that entered into negotiations with Gohlike and Torseth and ultimately agreed to sell the automobiles and parts to Torseth rather than Simeone in exchange for Gohlike's agreement to dismiss his suit against First Bank.

The district court properly held First Bank accountable for the breach of contract with respect to the Conan-Doyle car.

VI.

A trial court's authority to award prejudgment interest is governed by statute. See Minn. Stat. § 549.09. Prejudgment interest is an element of damages awarded to provide full

-11-

compensation by converting time-of-demand damages into time-of-verdict damages. It is designed to compensate the plaintiff for the loss of the use of the money owed. Johnson v. Kromhout, 444 N.W.2d 569, 571 (Minn. Ct. App. 1989). Prior to 1984, prejudgment interest was allowed on an unliquidated claim only where the damages were readily ascertainable by computation or reference to generally recognized standards such as market value. Solid Gold Realty, Inc. v. J.B. Mondry, 399 N.W.2d 681, 684 (Minn. Ct. App. 1987). In 1984, however, § 549.09 was amended to provide that "[t]he prevailing party shall receive interest on any judgment or award." Minn. Stat. § 549.09. The amended statute allows prejudgment interest "irrespective of a defendant's ability to ascertain the amount of damages for which he might be held liable." Lienhard v. State, 431 N.W.2d 861, 865 (Minn. 1988). Further, the expert's valuations based on the fair market value of the vehicles and parts, as well as First Bank's own assessment of the value of the property in 1985, satisfies the readily ascertainable standard. The "[m]ere difference of opinion as to the exact amount of damages [is] not sufficient to excuse the defendant from compensating the plaintiff for loss of the use of [his] money." Solid Gold Realty, Inc., 399 N.W.2d at 684 (quotation omitted).

We conclude that Simeone is entitled to prejudgment interest on the revised damages award.

VII.

Based on the foregoing, the judgment of the district court is affirmed in part and reversed in part and remanded for further proceedings consistent with the views expressed in this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.