# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 99-1052 and 99-1267

_____

| | | |
|---|---|---|
| Best Buy Co., Inc., | * | |
| | * | |
| Plaintiff-Appellant/ | * | |
| Cross-Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Fedders North America, Inc., | * | |
| | * | |
| Defendant-Appellee/ | * | |
| Cross-Appellant. | * | |

_____

Submitted:  November 18, 1999

Filed:  February 2, 2000

_____

Before BOWMAN, LAY, and HANSEN, Circuit Judges.

_____

LAY, Circuit Judge.

Best Buy Co., Inc. (Best Buy) appeals the district court's denial of damages in its breach of contract suit against Fedders North America, Inc. (Fedders).  We affirm in part, reverse in part, and remand.

## I. Background

Best Buy, a Minnesota corporation, is a retail operation that sells a variety of household goods, including window unit air conditioners. Fedders is a wholly-owned subsidiary of Fedders Corporation, a Delaware corporation. Fedders manufactures window unit air conditioners. In the fall of 1993, the parties entered into a written contract where Fedders would sell Best Buy window units and the latter would then resell them during the following summer. This agreement, known as the 1994 Program, provided for product costs, payment terms, and freight charges. Most importantly for purposes of this appeal, the contract also included an "Inventory Assistance" provision (IAP) which provided:

> Inventory Assistance - Fedders is offering Best Buy an Inventory Assistance program for 1994.
>
> Any of the five "core" models that Best Buy has in inventory on June 30th can be returned for full credit. The units must be in factory sealed cartons.

This provision was inserted into the 1994 Program largely at the insistence of Best Buy, which had previously refused to do business with Fedders because of Fedders' failure to provide an acceptable return policy, and was sought as assurance that it would not end up with a huge inventory at the end of the season.

The 1994 season came and went without incident, and the parties entered into subsequent one-year programs for the 1995 and 1996 seasons. The language in the IAP remained the same with the exception that the covered "core" models changed from year to year.

Pursuant to the 1996 Program, Fedders sold Best Buy $3,988,863 in core model units.[1] However, the summer of 1996 was unusually cool, and Best Buy's sell-through rate was not as good as in previous years. As a result, Best Buy attempted to invoke the IAP for the first time in 1996. Best Buy representatives contacted Fedders in mid-July of 1996 and requested Fedders take back the unsold core models and refund Best Buy the purchase price. Fedders refused. A meeting was held on July 23, 1996 to discuss the returns. During this meeting, Fedders' representatives stated that they would not accept the unsold units because, under the IAP, any such request needed to have been made by June 30, 1996, and the models shipped by July 10, 1996, in order to receive a full refund. Fedders claimed that these return deadlines were agreed upon orally as part of the IAP during its presentation of the 1994 Program and asserted that because the terms of the IAP remained unchanged throughout the parties' three-year relationship, the deadlines remained unchanged. Two Best Buy representatives present at the July 23 meeting testified to the effect that, up until that time, they were unaware of any return deadlines under the IAP. As of February of 1998, Best Buy still held unsold core model inventory valued at $232,259.[2]

Best Buy commenced this action in Minnesota state court on January 14, 1997. On February 12, 1997, Fedders removed the action to federal district court pursuant to 28 U.S.C. § 1441(a), alleging diversity jurisdiction under 28 U.S.C. § 1332(a)(1). At

---

[1] We note that the district court calculated the cost value of the units to be $3,867,725. We are not certain how the court came to this amount. Best Buy's damage calculations for this suit show that in September of 1996, Best Buy's core model inventory was valued at a cost of $3,988,863. Fedders does not dispute this valuation. Since the district court states in its Findings of Fact that Best Buy eventually realized $442,850 on the sale of these units, and this calculation is consistent with a finding that the inventory was valued at $3,988,863, we will assume that the lower court intended to use the $3,988,863 figure.

[2] This is the cost value of the remaining core models, not the estimated retail value.

trial, the court received parol evidence on the IAP and the alleged return deadlines. Best Buy sought damages in the amount of $880,107.[3]

The district court issued its Order for Judgment on November 25, 1998. Rejecting Fedders' contention that the return deadlines were part of the IAP, the court held that Fedders breached the contract by refusing to accept the core models. However, relying on Minnesota statutes, the district court held that § 336.2-706(1) dictated Best Buy's available remedies and limited its damages to the difference between the total resale price and the contract price, plus incidental damages less expenses saved as a consequence of the breach. Because Best Buy successfully sold some of the remaining inventory at a profit of $442,850,[4] the first part of the damages equation (resale price minus contract price) revealed no damages. The court then stated that any incidental damages suffered by Best Buy were outweighed by the expenses it saved as a consequence of the breach. Specifically, the court mentioned

---

[3]Best Buy's damages were broken down as follows:

| | |
|---|---|
| Markdown Damages | $102,309 |
| Advertising Expense | $ 6,268 |
| Damage Write Off & Inventory Shrink | $ 42,356 |
| Store Labor | $ 9,287 |
| Storage Costs | $ 88,251 |
| Shipping Costs | $ 57,265 |
| Carrying Costs | $341,752 |

[4]Fedders' claims that Best Buy only realized $432,850 in the sale of the units, not $442,850. This is an error in Fedders' calculations. Fedders' brief states at page 31 that the original purchase price of the core models was $3,998,863. However, as was noted earlier in this opinion, the actual purchase price was $3,988,863. This is the source of Fedders' $10,000 error in calculating Best Buy's sale profits. Regardless of the miscalculation, Fedders should take comfort in the fact that the error is actually in its favor.

the fact that under both the terms of the contract and the UCC, Best Buy was responsible for the attendant cost of shipping the unsold core models back to Fedders. Because Fedders breached by refusing to accept the models, Best Buy escaped any financial responsibility for their return.

In this appeal, Best Buy has abandoned its damage claims with the exception of $444,061, representing the markdown damages and carrying costs. Best Buy seeks either a reversal and remand with direction to enter judgment in its favor for an amount not less than $444,061 or a remand for recalculation of damages. Fedders cross-appeals the district court's finding of breach.

## II. Discussion

A. <u>Fedders' Cross-Appeal</u>

On cross-appeal Fedders challenges the district court's finding that the return deadlines were not "expressly incorporated" into the 1996 Program's IAP and its holding that Fedders breached by refusing to accept the units. In particular, Fedders faults the lower court for failing to give proper consideration to all its parol evidence, especially the testimony of Thomas Purcell, Senior Vice President of Sales and Marketing at Fedders (Purcell). Purcell was one of two Fedders employees who attended the 1993 meeting where the return deadlines were allegedly articulated. Purcell testified that he told Best Buy about the return deadlines during that meeting and that, to ensure understanding, he carefully explained the reasoning behind the deadlines. The district court rejected his testimony, along with the rest of the parol evidence offered, stating that it undermined rather than supported Fedders' position. The court found that Purcell's testimony "stood alone" for the argument that the return deadlines were included in the IAP and the testimony contrasted the written agreement.

1. *Purcell's testimony*

The "uncorroborated" nature of Purcell's testimony is a question of fact which this court reviews for clear error. See City Nat'l Bank of Fort Smith v. Unique Structures, Inc., 49 F.3d 1330, 1333 (8th Cir. 1995).

The district court received parol evidence in this case in an attempt to "resolv[e] the ambiguity presented by the inventory assistance program in light of the parties' positions," (Ct. Order at 4), and "explain the 'Inventory Assistance' portion of the agreement, especially as it relates to the June 30th date." (Ct. Order at 11). Under Minnesota Statute § 336.2-202, parties are barred from bringing evidence of any prior agreement or a contemporaneous oral agreement which contradicts the terms of a final, written contract. However, explanatory or supplemental evidence of the course of dealing or course of performance by the parties is admissible, as is evidence of consistent additional terms unless the writing is intended by the parties to be a complete and exclusive statement of the terms of the agreement. MINN. STAT. § 336.2-202(a)-(b) (1998).

Neither Best Buy nor Fedders challenge the admission of the parol evidence. Rather, the foundation of Fedders' cross-appeal is the court's allegedly insufficient consideration of the parol evidence. Fedders claims the district court was clearly erroneous in its finding that Purcell's testimony "stood alone," because the court failed to consider other evidence that supported the testimony.[5]

---

[5]Fedders lists six pieces of evidence in support of Purcell's testimony. They are: (1) Purcell's memo to Fedders' president, prepared shortly after the 1993 meeting, stating that Best Buy's representative "was pleased with the core model return on June 30th provision"; (2) Purcell's testimony that he told management after the 1993 meeting that he had explained the return deadlines to Best Buy, evidenced by Fedders' deal sheet for the 1994 Program which contains a handwritten note stating "June return on core models is in place"; (3) testimony of Thomas Kroll, corporate controller for

After reviewing the district court's opinion, we find that the court was not clearly erroneous in its factual findings. In the bench trial below, the district court judge was the trier of fact. It is evident that the court weighed the extrinsic evidence and found it insufficient to support Purcell's testimony. See Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1299 (8th Cir. 1997) (credibility determinations are to be made by the trier of fact); Pacyga v. FMC Corp., 581 N.W.2d 859, 861 (Minn. 1998) (same). As we see nothing in the record that suggests this finding to be clearly erroneous, we are bound to affirm it.

2. *Fedders' breach*

A district court's interpretation of state law is subject to de novo review. See Unique Structures, 49 F.3d at 1333 (citing Salve Regina College v. Russell, 499 U.S. 225, 231 (1991)). As we noted in the preceding subsection, we are bound by the district court's findings of fact regarding Purcell's testimony. Thus, the question becomes whether, upon independent review, there exists sufficient evidence of breach to support the lower court's decision.

We find that the evidence presented is sufficient to support the finding that the return provisions were not included in the 1996 Program. As both the district court and

---

Fedders Corp., stating that a group of Fedders' managers had discussed the fact that the 1994 Program contained a June 30 notification date and a July 10 return date; (4) testimony of George Stadler (Stadler), another attendee of the 1993 meeting and Fedders employee, that he believed Best Buy was required to notify Fedders by June 30 and return the product "[s]ometime in July"; (5) Fedders' inventory tracking system and Inventory Weekly Report, which was only used with the Best Buy account because of the IAP; and (6) testimony of Purcell and Stadler describing communications between Best Buy and Fedders representatives in May and June of 1996 regarding Best Buy's plans for its remaining inventory. (Fedders Br. at 24-25; Fedders Reply Br. at 16.)

Best Buy pointed out, Purcell's own testimony contained internal inconsistencies.[6] Additionally, there is physical evidence and testimony by other individuals which also refutes Fedders' contention that the return provisions were "expressly incorporated" into the 1996 Program. First, Tom Repinski (Repinski), National Market Reaction Analyst for Best Buy and a former seasonal products buyer, testified that although he dealt directly with Fedders during the 1995 and 1996 seasons, he was never notified of a June 30 return date. He also stated that, in choosing a program for the upcoming season, the chosen program superseded the old program. This testimony works against Fedders' argument that the return deadlines carried over from the 1994 Program. Second, David Anderson (Anderson), National Marketing Manager for Best Buy and former Senior Buyer, testified that he understood the 1996 Program to allow for "100% return of 'core' models," as evidenced by a handwritten spreadsheet he created in early 1996.[7] Like Repinski, Anderson also stated that he was unaware of the return deadlines for the 1996 season. This is further supported by the testimony of George Stadler (Stadler), a Fedders employee closely involved with the Best Buy account. Stadler stated that both Repinski and Anderson expressed surprise upon learning of the return deadlines at the July 23, 1996, meeting.

---

[6]The court noted:

> Mr. Purcell testified that each yearly program stood on its own and that the terms of each yearly program did not carry over to the next year. He also testified that Fedders' company policy would not allow a sales representative to orally change the Program after it had been issued from headquarters and he believed that both parties relied on the written Program to determine their obligations.

(Ct. Order at 6.) (emphasis added).

[7]This spreadsheet contained the payment terms, floor plans, and return policies for six different unit manufacturers. Under Fedders' return policy, Anderson wrote, "100% return of 'core' models."

Best Buy also presented evidence in the form of an October 25, 1994, memo directed to Purcell from Fedders' upper management asking that Best Buy's written program include the language: "[a]ny of the (X) core models that X has in inventory on June 30, can be returned for full credit no later than July 10, 1995. These units must be in factory sealed cartons."[8] Purcell testified that this language was never inserted into either the 1995 or 1996 programs. Finally, Stadler, the individual at Fedders with perhaps the most contact with Best Buy during the relevant seasons, testified that he was never told by anyone at Fedders to revise the language of the 1996 Program. He also stated that he was never told prior to July of 1996 that he should tell Best Buy that product should be returned by a specified date. All this evidence is strong support for the conclusion that the return deadlines were not a part of the 1996 Program; thus, Fedders breached the agreement.

After detailed consideration of Fedders' counter-evidence, we find it insufficient to upset the district court's holding on this issue. Although Stadler's testimony is somewhat useful in determining whether program terms carried over from year to year, there is countervailing evidence that each new program stood independent of its predecessor. Furthermore, even if Stadler's testimony is accepted on this point, Fedders still must establish that Best Buy was aware of the return deadlines in 1993, and this it has failed to do. Thus, we affirm the lower court's holding that because the return deadlines were not part of the 1996 Program, Fedders breached the contract in refusing to accept Best Buy's tender of the core models.

---

[8]We recognize that this memo was sent after the 1993 meeting and, thus, after Fedders alleges to have informed Best Buy of the return deadlines. Nevertheless, this evidence supports the contention that return deadlines, should any exist, would normally be written as opposed to oral. In fact, Fedders and Sears' 1995 and 1996 written Programs specifically provided as much.

B.  Best Buy's Remedies

The district court, relying primarily on Minnesota statutory law and the parties' agreement, held that Best Buy assumed the role of a seller when it chose to return the unsold units and, as such, it was not entitled to consequential damages in accordance with § 336.2-710.[9]  The court characterized the transaction as a "sale or return" under Minnesota law.  In so holding, the court relied on Minnesota law which states: "[u]nless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is a 'sale or return' if the goods are delivered primarily for resale."  MINN. STAT. § 336.2-326(1)(b) (1998).  Furthermore, the court observed that the UCC defines a "person in the position of a seller" to include "anyone who otherwise holds a security interest or other right in goods similar to that of a seller."  MINN. STAT. § 336.2-707(1) (1998).  The court used both of these UCC provisions to classify Best Buy as a seller, thereby limiting Best Buy to incidental (as opposed to incidental and consequential) damages under Minn. Stat. § 336.2-710.

Fedders urges that since Best Buy held title to the units before seeking this return, Best Buy should be treated as a seller under the facts of this case.  We respectfully disagree with this characterization and reverse and remand the issue of available remedies.

---

[9]Minn. Stat. § 336.2-710 states:

Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

MINN. STAT. § 336.2-710 (1998).

First, we feel the district court misapplied § 336.2-326(1)(b). Comment 1 to 326.2-326 recites: "[t]he type of 'sale or return' involved herein is a sale to a merchant whose unwillingness to buy is overcome only by the seller's engagement to take back the goods (or any commercial unit of goods) in lieu of payment if they fail to be resold." MINN. STAT. ANN. § 336.2-326, cmt. 1 (West 1966) (emphasis added). See, e.g., National Iranian Gas Co. v. Basco Indus., Inc., 507 F. Supp. 563, 565 (E.D.La. 1981) (in denying plaintiff recovery for malfunctioning equipment, the court observed "[t]he essence of the sale or return contract is the agreement that, upon delivery of the goods, the buyer has the option to either pay the purchase price or return the items"). The district court's application overlooks the terms of the contract between the parties. In this case, Fedders did not agree to accept the return units in lieu of payment. Rather, money had already exchanged hands, and Best Buy sought the refund of this money upon exercising its rights under the IAP. Thus, the 1996 Program was arguably not the type of contractual relationship covered by § 336.2-326.

Even if one could describe the agreement between Best Buy and Fedders as a "sale or return," we have difficulty seeing how that suddenly transforms Best Buy into a seller and Fedders into a buyer. Relying on Minn. Stat. § 336.2-401(2) (1998), Fedders argues that title passed to Best Buy when it accepted the initial delivery of the units.[10] By invoking the IAP, Fedders avers that Best Buy sought to pass title back to Fedders, effectively "reselling" its units.

Under the 1996 Program, it is true that Best Buy held title to the units it sought to return in July of 1996, and it is equally indisputable that Best Buy sought to pass title back to Fedders by invoking the IAP. Nevertheless, Fedders explicitly contracted with

_____

[10]Minn. Stat. § 336.2-401(2) provides: "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes performance with reference to the physical delivery of the goods . . . ." MINN. STAT. § 336.2-401(2) (1998).

-11-

Best Buy to give the latter the opportunity to send certain core models back in exchange for the money it paid for them. Thus, the IAP acted as a conditional right of return, allowing Best Buy to divest itself of title of units that met specific qualifications. This right of return was a bargained-for term of the contract that Best Buy requested and Fedders specifically created. This protective provision should not now be interpreted so as to punish Best Buy. The IAP acted as a right and remedy in addition to those buyer's remedies which Best Buy is entitled to under the UCC. Such interpretation is permissible under Minnesota Statute § 336.1-102(3) (1998), which provides that the effect of UCC provisions may be varied by agreement.[11] Therefore, the mandates of § 336.2-401 do not necessitate a finding that Best Buy is relegated to seller's remedies in this instance.

Fedders further cites § 336.2-326(4) as support for its recharacterization of Best Buy as a seller.[12] We reject Fedders' reading of this provision. Section 336.2-326(4) does not stand for the broader proposition that any "or return" provision automatically turns a buyer into a seller once it is utilized. Rather, § 336.2-326(4) merely requires that any "or return" provision be written in order to be enforceable under the UCC's

---

[11]This subsection makes an exception for the requirements of good faith, diligence, reasonableness, and care, which cannot be contracted away. The comment to this section states that "an agreement can change the legal consequences which would otherwise flow from the provisions of the Act." MINN. STAT. ANN. § 336.1-102, cmt. 2 (West 1966).

[12]Minn. Stat § 336.2-326(4) states:

Any "or return" term of a contract for sale is to be treated as a separate contract for sale within the statute of frauds section of this article (section 336.2-201) and as contradicting the sale aspect of the contract within the provisions of this article on parol or extrinsic evidence (section 336.2-202).

MINN. STAT. §336.2-326(4).

Statute of Frauds. Moreover, in accordance with the parol evidence rule, an "or return" provision must be in writing and made contemporaneously with or subsequent to the writing at issue. This is due to the fact that an "or return" provision stands in contradiction to ordinary terms of sale. Section 336.2-326(4) simply states that, for the limited purposes of the Statute of Frauds and the parol evidence rule, an "or return" provision is treated as a separate contract that must exist in writing. This reading is supported by Comment 3 to § 336.2-326, which explains that "[s]ubsection (4) resolves a conflict in the pre-existing case law by recognition that an 'or return' provision is so definitely at odds with any ordinary contract for sale of goods that where written agreements are involved it must be contained in a written memorandum." MINN. STAT. ANN. § 336.2-326, cmt. 3 (West 1966). The section says nothing about creating a new transaction for purposes of calculating damages.[13] For these reasons, we find neither § 336.2-401 nor § 336.2-326(4) support or require the reclassification of Best Buy as a seller.

Best Buy interprets § 336.2-326(4) in an even more limited fashion, arguing that it is meant to address only creditor's rights, not breach of contract issues. Anderson on the Uniform Commercial Code lends credence to this position.

> With respect to the creditors of the buyer, a delivery to the buyer of goods, regardless of its intended character between the parties, is treated as a sale or return when the buyer is a regular dealer in that kind of goods. This is so when the goods are delivered for sale to a person who maintains a place of business at which that person[] deals in goods of the kind involved under any name other than the name of the seller or person making the delivery.

---

[13]Anderson on the Uniform Commercial Code states that the effect of an "or return" provision is to rescind or cancel the sales transaction. 3A RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2-327:30, at 476 (3d ed. 1995).

Anderson, supra, § 2-326:79, at 445 (emphasis added).[14]  Furthermore, Comment 1 explicitly states that § 336.2-326 does not address the issue of remedies for breach of contract; rather, it is concerned with the option to refuse and return goods even though they conform to the agreement.  Consequently, we note that reliance on § 336.2-326(4) may be inappropriate outside the buyer-creditor relationship.  However, because that specific issue is not before us, we decline to pass on it here.

Fedders cites Cole v. Melvin, 441 F. Supp. 193 (D.S.D. 1977) (mem.), to uphold the repositioning of Best Buy as a seller.  In that case, Cole agreed to buy sixteen exotic heifers from Melvin for just over $3,000.00 each.  The contract provided in relevant part that "Melvin agrees to purchase same heifers at Four Thousand dollars

_____

[14]We note that many of the cases from this circuit addressing § 336.2-326 do so for purposes of determining creditor rights.  For instance, in Weidinger Chevrolet, Inc. v. Universal C.I.T. Credit Corp., 501 F.2d 459 (8th Cir. 1974), a car dealer kept cars on its lot in a consignment-type relationship with the appellee Weidinger.  The appellant, C.I.T., foreclosed a security interest in the dealer's property, including some of Weidinger's cars.  Weidinger sued to recover the value of the cars, and this court found that although Weidinger owned the cars, they were in the dealer's possession under a "sale or return" and were therefore subject to the claims of the dealer's creditors.  Additionally, in First Nat'l Bank of Blooming Prairie v. Olsen, 403 N.W.2d 661 (Minn. Ct. App. 1987), one of the few Minnesota cases to address the UCC's "sale or return" provision, a feedlot owner entered into a loan agreement where the bank took a security interest in the owner's personal farm property, including livestock.  Certain cattle owners had delivered their cattle to Olsen without clarifying whether she could sell them (as she was widely known to do) or giving any public notice of a retained interest in the cattle.  The bank eventually initiated a replevin action.  The court, holding that the relationship between the feedlot and cattle owners was a "sale or return," limited its § 336.2-326 inquiry to whether the cattle owners' or the feedlot owner's creditors had a primary interest in the cattle as collateral.  Finally, we note In re Truck Accessories Distrib., Inc., 238 B.R. 444, 447 (Bankr. E.D.Ark. 1999), where the court described § 336.2-326(3) as "designed to prevent creditors from being misled by a hidden lien."

each guaranteed safe in calf . . . ." Cole, 441 F. Supp. at 198. When Cole sought to sell some of the pregnant cattle back to Melvin, Melvin refused to accept them. The court held that Melvin became the buyer in the attempted return sale by Cole; thus, Cole was limited to incidental damages as a seller.

Best Buy responds by citing Maxwell v. Crabtree Ford, Inc., 543 N.Y.S.2d 626 (N.Y.Just. Ct. 1989). In Maxwell, the plaintiff bought a new Jeep Wrangler from the defendant. After months of difficulties with the automobile, she sought to return it to the dealership. The dealership refused, and the plaintiff eventually sold the Jeep at a loss. The court awarded the plaintiff buyer's remedies under the UCC.

Maxwell is factually distinguishable as a case dealing with defective goods. There is no question that a recipient of a defective good is entitled to buyer's as opposed to seller's remedies. See MINN. STAT. §§ 336.2-608, 336.2-714 (1998); See also Barry & Sewall Indus. Supply Co. v. Metal-Prep of Houston, Inc., 912 F.2d 252, 256-58 (8th Cir. 1990); Soo Line R.R. Co. v. Fruehauf Corp., 547 F.2d 1365, 1373 (8th Cir. 1977).

Cole is also distinguishable. The language of the contract at issue in that case specifically provided that the defendant would "purchase" the goods, necessarily contemplating a second sale between the parties. There is no such language found in the 1996 Program. Rather, the program simply provided that any factory-sealed core models "can be returned." This language does not denote a second sale the same way the word "purchase" does. Fedders responds that this language differential is immaterial since the parties in Cole contracted for a "purchase" followed by another potential "purchase" and the parties in this case contracted for a "sale or return," "which the UCC plainly explains [to be] a 'purchase' and then a 'sale.'" (Fedders Br. at 37.) We reject this argument.

-15-

To begin with, it is rather disingenuous to argue that the parties contracted for a "sale or return." While Fedders and the district court deemed the agreement a "sale or return," the contract itself does not clearly provide that the IAP is a "sale or return" provision. This is especially important given the requirements of § 336.2-326(4) and the fact that we are not entirely convinced that the IAP qualifies as a "sale or return." Second, Fedders' argument assumes a premise that we have denied; namely, the treatment of a "sale or return" as a purchase and subsequent sale for purposes of calculating damages.

We also note that the defendant in Cole agreed to repurchase the heifers at a different price than that for which they were originally sold. This is more suggestive of a sale and resale than the conditional right of return at issue in this case. Fedders claims this is of no moment in this appeal because "Best Buy [similarly] contends that there is a price attached to keeping goods for a period of time."[15] (Fedders Br. at 37.) This is not an apt comparison. The parties in Cole contemplated a different resale price without breach considerations. Best Buy, on the other hand, claims carrying costs only because Fedders breached. Fedders cannot use alleged damages from its own breach to liken the transaction at issue to a sale.

In sum, this is an unusual case calling for difficult answers to novel questions. We appreciate the fact that we are treading in unfamiliar waters, as did the district court before us. After close analysis of the facts of this case and the sparse law on the subject, we conclude it is more appropriate to deem Best Buy a buyer than a seller in this situation. The contract itself envisions only one transaction, with Best Buy as the buyer with a bargained-for right of return ("take back" contract), rather than two separate sales in which buyer and seller switch places ("buy back" contract). Furthermore, no provision of the UCC prohibits return-for-full-credit contracts, and treating Best Buy as the buyer allows it to retain the benefit of its original bargain. This

---

[15]This is in reference to Best Buy's claim for carrying costs.

logic, in addition to the many difficulties inherent in treating Best Buy as a seller, convinces us of the propriety of our approach.

C. Damages Calculation

The conclusion that Best Buy remains a buyer after exercising its rights under the IAP is not necessarily the deciding factor in the case. It still must be determined what, exactly, Best Buy is entitled to recover. Section 336.2-715 presents a nonexhaustive list of the incidental and consequential damages available to a buyer under the UCC.[16] In particular, the statute requires that any consequential damages must be foreseeable to be awarded. See Simeone v. First Bank Nat'l Ass'n, 73 F.3d 184, 188 (8th Cir. 1996) (explaining that consequential damages "are only proper if the seller had reason to foresee the particular requirements of the buyer, and even then only if such loss could not be prevented"); Karlen v. Butler Mfg. Co., 526 F.2d 1373, 1379

---

[16]The statute states:

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty.

MINN. STAT. § 336.2-715(1)-(2) (1998).

& n.9 (8th Cir. 1975) (discussing the foundation of the foreseeability requirement for consequential damages). The question of whether a buyer's damages were foreseeable is one of fact. Simeone, 73 F.3d at 188.

As the reviewing court, we are faced with one remaining issue: if the district court found that Best Buy's damages were not foreseeable, as required by Minnesota Statute § 336.2-715(2)(a), and if we do not find that holding to be clearly erroneous, then there is no reason to remand because Best Buy would still not be entitled to damages. Thus, we must review the lower court's opinion and determine what, if anything, it found regarding foreseeability.

The district court's discussion of the issue of foreseeability is limited, assumedly because the court was working from a seller's damages standpoint where consequential damages are not an issue. Moreover, the court was of the opinion that no damages were available to Best Buy as a seller. Thus, the lower court simply stated: "Fedders introduced evidence that [Best Buy's markdown damages and carrying costs] were, at any rate, not foreseeable and therefore not recoverable." (Ct. Order at 9.) Although this statement is found in the court's Findings of Fact, it is unclear whether it is actually a finding of fact or merely a description of evidence presented to the court. Nowhere does the order state that the court adopted this evidence in its reasoning. The conclusions regarding Best Buy's damages concentrate on the differences between: (1) the value of the units and their resale price, and (2) Best Buy's incidental damages (if any) and the expenses saved in consequence of the breach. The court never cites a dollar value for the amount saved by Best Buy, but the briefs suggest that it was anywhere from $55,000 to $71,000. Best Buy's alleged markdown damages were in excess of $102,000, and its claimed carrying costs were over $340,000. Because the lower court found that the amount saved (between $55,000 and $71,000) exceeded any incidental damages, one can deduce that the lower court did not consider either the markdown damages or carrying costs to be incidental. Thus, the court probably considered them consequential and outside Best Buy's scope of remedies as a seller.

Nevertheless, nowhere in the order does the court state an opinion on their foreseeability.

We read the district court's opinion as declining to make a holding on the foreseeability of the sought-after damages.  Thus, we have no basis to review the court on this issue.  The actual calculation of damages is a question for the district court, and we leave that task for remand.  See United States on Behalf of Cheyenne River Sioux Tribe v. South Dakota, 105 F.3d 1552, 1561 (8th Cir. 1997) (remanding the issue of damages to the district court after the court erroneously held that damages were barred).

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court on the issue of breach and we REVERSE on the issue of Best Buy's entitlement to buyer's remedies and REMAND for a damages calculation in accordance with this judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.